IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ANDRES JALON**,<br><br>and<br><br>**REGENNA JALON**,<br><br>        Plaintiffs,<br><br>-vs-<br><br>**BANK OF AMERICA, N.A.**,<br><br>**WILSHIRE CREDIT CORPORATION**, a subsidiary of **INTERNATIONAL BUSINESS MACHINES CORPORATION**,<br><br>**URBAN SETTLEMENT SOLUTIONS (d/b/a URBAN LENDING SOLUTIONS**,<br><br>and<br><br>**HSBC BANK USA, N.A.**, as Trustee for the Holders of the Ellington Loan Acquisition Trust 2007-1, Mortgage Pass-Through Certificates, Series 2007-1,<br><br>        Defendants. | Civil Action No.: 22-cv-4039 |

## **COMPLAINT**

COME NOW the Plaintiffs, ANDRES JALON and REGENNA JALON, by and through their undersigned attorney, and hereby allege as follows:

### **NATURE OF THE ACTION**

1.     This is a federal action brought pursuant to 18 U.S.C. § 1964(c).

2.     The Plaintiffs seek relief, including compensatory damages, punitive damages, costs, and attorney's fees.

### **PARTIES**

3.     The Plaintiffs, ANDRES JALON and REGENNA JALON (hereinafter, the "Plaintiffs") are adult individuals and are the real owners of the real property commonly known as 1221 Huntingdon Pike, Huntingdon Valley, PA 19006 (hereinafter, the "Property").

4.     Defendant BANK OF AMERICA, N.A., (hereinafter, "BOA") is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255. Bank of America, N.A., performs substantial business within the state of Pennsylvania. Bank of America, N.A., has formerly done business under the name BAC Home Loans Servicing, LP, which was formerly a subsidiary of Bank of America, N.A., and was later merged with Bank of America, N.A., which is now a successor by merger.

5.     Defendant WILSHIRE CREDIT CORPORATION (hereinafter, "Wilshire") is a mortgage servicer company organized under the State of Nevada, with headquarters at 14523 SW Millikan Way, Ste. 200, Beaverton, OR 97005. From 2008 to 2010, Wilshire was owned by BOA, but it was purchased on March 1, 2010, by INTERNATIONAL BUSINESS MACHINES CORPORATION (hereinafter, "IBM"), an organization incorporated in the State of New York, with headquarters at 1 Orchard Rd, Armonk, NY 10504.

6.     Defendant URBAN SETTLEMENT SOLUTIONS (d/b/a URBAN LENDING SOLUTIONS, (hereinafter, "Urban") is a limited liability corporation organized under the laws of Pennsylvania with its main offices located in Broomfield, Colorado, and which does business throughout the United States, including in the Commonwealth of Pennsylvania.

7.     Defendant HSBC BANK, N.A., (hereinafter, "HSBC") is registered to conduct business in the Commonwealth of Pennsylvania or exempt from registration and having a place of business c/o Nationstar Mortgage, LLC, at 8950 Cypress Waters Boulevard, Coppell, TX 75019.

8.     At times herein mentioned, Defendant Bank of America, N.A., also did business as

BAC Home Loans Servicing, LP. Both of these entities, individually and collectively, were agents and/or joint ventures of each other and, in doing the acts alleged herein, were acting within the course and scope of such agency. Collectively, these entities are referred to in this Complaint as "BOA."

## JURISDICTION AND VENUE

9.      Venue is proper in the Eastern District of Pennsylvania, as this Court has original federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act (hereinafter, "RICO"), 18 U.S.C. §§ 1961-1968.

10.      The Court also has subject-matter jurisdiction over the Plaintiff's federal law claims, pursuant to 28 U.S.C. §§ 1331 (federal question).

11.      This Court also has supplemental jurisdiction over the Plaintiffs' state law claims, pursuant to 28 U.S.C. § 1367(a).

12.      All conditions precedent to the maintenance of this action have been performed, have occurred prior to its institution or have been waived.

## BACKGROUND

### A.      OVERVIEW.

13.      In early 2009, BOA took more than $45 billion in government-bailout money. As a condition of receiving this bailout, BOA agreed to participate in the Home Affordable Modification Program (hereinafter, "HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

14.      BOA signed a contract with the U.S. Treasury on April 17, 2009, agreeing to

comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.

15.     Though BOA accepted billions of dollars and contractually agreed to comply with the HAMP directives and extend loan modifications to eligible homeowners, BOA has systematically and deliberately worked to sabotage HAMP and to modify as few mortgages as possible according to its terms. BOA found it was more profitable if homeowners accepted inhouse modifications rather than the loan modifications mandated by the HAMP process.

16.     Consequently, BOA pushed homeowners who were applying for HAMP modifications toward more expensive in-house modifications using tactics of outright fraud.

17.     Rather than working diligently to reduce the number of loans in danger of default by establishing permanent modifications, BOA serially strung out, delayed, and otherwise hindered the modification processes that it agreed to facilitate. BOA's delay and obstruction tactics have taken various forms with the common result that homeowners with loans BOA serviced, and who met the requirements for participation in HAMP, did not get a fair opportunity to secure a permanent loan modification through the HAMP process.

18.     To accomplish its objectives, BOA created a widespread RICO enterprise to defraud homeowners who sought modifications and then acted as the kingpin of that enterprise.

19.     On or about March 1, 2010, BOA acquired Wilshire.

20.     BOA enlisted Urban and Wilshire to act as a member of, and partner in, the RICO enterprise and assigned to Urban and Wilshire the management of key aspects of the HAMP loan modification process, including interacting with homeowners seeking HAMP modifications, collecting and processing documents from homeowners, and corresponding with homeowners. BOA and Urban worked in concert, under BOA's direction and for many years, to frustrate the

HAMP process and to prevent as many homeowners as possible from obtaining permanent loan modifications that complied with HAMP while allowing BOA to maintain the appearance to regulators and the public of trying to comply with its HAMP obligations.

21.     Through this relationship and with this common goal, BOA, Wilshire, and Urban formed an association-in-fact enterprise that was effectuated through the use of thousands of false wire and mail communications, as well as acts of extortion.

22.     As part of the loan-modification scheme and enterprise, homeowners seeking HAMP trial plans were directed by wire and mail instructions from BOA to send financial information directly to either Wilshire or Urban.

23.     As part of the loan-modification scheme and enterprise, Urban and Wilshire became "black holes" for documents sent by homeowners.

24.     As part of the enterprise and scheme, BOA used the mail and wires to falsely deny modifications by claiming that information required of homeowners seeking a HAMP modification had not been received, when in fact BOA, Wilshire, and Urban had received the documents.

25.     These actions were taken with the full knowledge, and at the direction, of the individuals tasked with running Defendants' HAMP modification program.

26.     This scheme was conducted via interstate mail and phone lines, in thousands of documents sent via mail and overnight courier, including documents and phone calls intended to deceive borrowers into believing they would receive HAMP modifications, and letters and phone calls which were knowingly false about why borrowers were not receiving HAMP modifications.

27.     Because of the BOA/Wilshire/Urban loan-modification scheme, hundreds of thousands of homeowners were wrongfully being deprived of an opportunity to cure their

delinquencies, pay their mortgage loans and save their homes.

28.     By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, BOA has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from BOA.

## B.  THE FORECLOSURE CRISIS.

29.     In the mid-2000s, the country was marked by the inflation and bursting of one of the largest asset bubbles in United States history. After U.S. home prices increased by 132 percent from the first quarter of 1997 to the second quarter of 2006 (an average annual increase of 9.5 percent), U.S. home prices decreased by 35 percent from the second quarter of 2006 to the first quarter of 2012 (an average annual decrease of 7.1 percent). Over the same time period of the home price collapse, unemployment increased from 4.6 percent at the end of the second quarter of 2006 to 8.2 percent at the end of the first quarter of 2012.

30.     During the housing bubble, many mortgages were originated with features that made them vulnerable to default should the economy deteriorate in conjunction with decreasing home values. These loan features included prepayment penalties, and adjustable-rate terms with low introductory "teaser" rates that resulted in significantly higher monthly payments once the rates reset.

31.     Countrywide Home Loans was among the most aggressive companies in originating loans with these abusive features. With its purchase of Countrywide in 2008, BOA acquired hundreds of thousands of loans that were deceptively originated and that included features that made borrowers increasingly vulnerable to default.

32.     Once the bubble burst, foreclosures skyrocketed as economic conditions created

difficulty for many borrowers in meeting their mortgage obligations (and borrowers with negative equity in their homes were less likely to continue making mortgage payments). Falling housing prices made it difficult for distressed homeowners to sell or refinance their houses, especially if they had negative equity. The Center for Responsible Lending estimates that 6.4 percent of all mortgages originated from 2004 to 2008 were already lost to foreclosure as of February 2011.4 Another 8.3 percent of all loan originations made from 2004 to 2008 were at least 60 days delinquent or in the foreclosure process as of February 2011.

      **C.**      **HAMP.**

33.      In response to this foreclosure crisis, the federal government developed the Making Home Affordable ("MHA") program. HAMP was developed as a part of MHA to help keep homeowners in their homes by incentivizing mortgage servicers to modify the loan terms for borrowers who were delinquent or in danger of becoming delinquent on their loans.

34.      When President Obama announced HAMP on February 18, 2009, he described it as a plan to eliminate a "maze of rules and regulations" in which homeowners rarely find answers, and in which "your ability to restructure your loan depends on where you live, the company that owns or manages your loan, or even the agent who happens to answer the phone on the day that you call." The President announced that HAMP "establishes clear guidelines for the entire mortgage industry that will encourage lenders to modify mortgages on primary residences.… This will enable as many as 3 to 4 million homeowners to modify the terms of their mortgages to avoid foreclosure." The President described the shared responsibility under HAMP as follows:

> So this part of the plan will require both buyers and lenders to step up and do their part, to take on some responsibility. Lenders will need to lower interest rates and share in the costs of reducing monthly payments in order to prevent another wave of foreclosures. Borrowers will be required to make payments on time in return for this opportunity to reduce those payments.

35.     The HAMP program is administered by the U.S. Treasury Department (hereinafter, the "Treasury"). All banks participating in the Troubled Asset Relief Program (hereinafter, "TARP") were required to participate in HAMP, while other banks could participate voluntarily. BOA accepted over $45 billion in TARP bailout money.8 BOA thus signed a "Servicer Participation Agreement" with Treasury to participate in HAMP at its outset in April 2009. As with all participating servicers, BOA was required to solicit certain borrowers to apply for HAMP assistance.

36.     HAMP was designed to enhance the incentives of mortgage loan investors and servicers to modify loan terms to lower monthly payments. By modifying the loan, investors (and servicers) would initially receive lower payment cash-flows than they would have received under the original mortgage contract, but the likelihood of the borrower defaulting on the loan would decrease and the costs of foreclosure to borrowers, investors, servicers, and to communities could be avoided.

37.     Treasury's regular evaluations of HAMP performance demonstrate the significant benefits to borrowers who receive HAMP modifications. As of June 2010, Treasury reported that 100 percent of permanent modifications featured an interest rate reduction, 56 percent had term extensions, and 29 percent included principal forbearance. The median monthly principal and interest payment was reduced 41 percent for modified loans, from $1,422 to $838.12 By the end of 2012, Treasury reported that homeowners in permanent HAMP modifications for all servicers had saved an estimated $17.3 billion in monthly mortgage payments.13 Borrowers receiving HAMP modifications also realized a lower likelihood of re-default than borrowers receiving other types of modifications.

38.     Treasury requires Participating Servicers to evaluate all loans that are 60 or more

days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification.

**D.     HAMP ELIGIBILITY.**

39.     The modification process consisted of two stages. In the first stage, the servicer collects and evaluates information from the borrower and from its own records. If the borrower meets specific eligibility guidelines for a HAMP modification, the servicer is required to offer the borrower a Trial Period Plan. As described in the Trial Period Plan itself, the servicer then has the three-month trial period to verify that initial information.

40.     During this first stage of the HAMP modification, before offering the Trial Period Plan, the servicer must evaluate whether the borrower meets specific eligibility guidelines for a HAMP modification:

o The home must be an owner-occupied, single-family 1-to-4 unit property;

o The home must be a primary residence;

o The home must not be vacant or condemned;

o The home's first-lien mortgage must not have an unpaid principal balance exceeding $729,750 (with higher limits for multiple-unit properties);

o The home mortgage was not previously modified under HAMP;

o The mortgage is currently 60+ days delinquent, default is "reasonably foreseeable," or the mortgage is in foreclosure;

o The borrower has submitted a Hardship Affidavit documenting a borrower's financial hardship; and

o The borrower's monthly payment, including principal, interest, taxes, and insurance ("PITI") prior to the modification, is greater than 31 percent of the borrower's monthly income.

41.     After using available information provided by the borrower and drawn from its own files, the servicer determined if each of these threshold requirements is met. Further, using that same information, the servicer evaluated borrower's eligibility at this stage via the waterfall and NPV processes (described in more detail below). If, on the basis of that information, the homeowner qualified for a HAMP modification, through these processes, the servicer would then offer the homeowner a Trial Period Plan. As described in the Trial Period Plan itself, the servicer then had the three-month trial period to verify that initial information.

42.     If application of the steps in the Program Documentation yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a Trial Period Plan Agreement if the modification provides a net present benefit to the mortgage holder.

43.     This determination is known as the "Net Present Value" or "NPV" test and is to be performed prior to the tender of a Trial Period Plan Agreement.

44.     If the homeowner complies with the Trial Period Plan's written requirements (including making all monthly Trial Period Plan payments), and the servicer's verification process revealed no variations in the verified information outside of HAMP parameters, then the second stage of the HAMP process is triggered, requiring an offer of a permanent modification.

45.     Servicers are restricted from initiating foreclosure or continuing previously initiated foreclosure processes against any properties with loans that are eligible for HAMP but (i) have not been evaluated, (ii) are in the evaluation process, or (iii) are in an active Trial Period Plan. The servicer must also coordinate with the mortgage insurer on the HAMP modification process for loans with mortgage insurance.

46.     At the outset of HAMP in 2009, BOA used a standard form agreement to offer Trial Period Plans to eligible homeowners. This agreement describes the homeowner's duties and

obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements. This Trial Period Plan was intended to, and did, induce homeowners to make trial payments and to expect that they would receive a permanent modification once they made all trial payments on time. However, as described at length below, pursuant to their loan modification scheme and enterprise, BOA, Wilshire, and Urban intended to deny modifications to the vast majority of borrowers even if they complied with all the requirements set forth in the Trial Period Plans.

47.    In March 2010, Treasury revised the process by requiring servicers to verify all financial information before issuing a Trial Period Plan to a borrower seeking a HAMP modification. Though BOA had required homeowners to submit financial documents before receiving a trial-payment agreement from the outset, BOA took this opportunity to revise its formal policies and to revise the form Trial Period Plan it used going forward. In response to several court decisions that found the form Trial Period Plan that BOA used constituted a contract, in approximately July 2010, BOA began using a form Trial Period Plan that included more conditional language. Nevertheless, the form Trial Period Plan used after July 2010 was intended to, and did, induce homeowners to make trial payments and to expect that they would receive a permanent modification once they made all trial payments on time. However, as described at length below, pursuant to their loan-modification scheme and enterprise, BOA, Wilshire, and Urban intended to deny modifications to the vast majority of borrowers even if they complied with all the requirements set forth in the Trial Period Plans.

48.    The goal for a HAMP modification is to reduce a borrower's total payment (including principal, interest, taxes, insurance, and association fees) to 31 percent of their current income for a five-year period. To determine the loan modification and associated incentives that

must be offered under HAMP to achieve this goal, participating servicers must use a "waterfall" procedure to determine the loan terms for the potential final modification. Specifically, the standard waterfall procedure states the steps to be taken in the following order:

> o Interest Reduction: First, reduce the interest rate in 0.125 percent increments as needed (to a rate no lower than two percent) by re-amortizing the outstanding balance over the remaining life of the loan.

> o Term Extension: Second, if the Debt-to-Income (hereinafter, the "DTI") remains above 31 percent at a two percent interest rate, extend the remaining term of the loan up to a maximum of 480 months from the Modification Effective Date (hereinafter, the "MED") to the extent allowed by existing servicing agreements.

> o Principal Forbearance: Third, if the DTI remains above 31 percent after calculating the first two steps, shift the necessary amount of principal necessary to achieve 31 percent DTI to a non-interest-bearing balloon payment. The amount of this balloon payment is termed the principal forbearance because the servicer forebears earning interest on this principal amount.

49. After five years, the interest rate on the modified loan may increase up to one percent per year until it reaches the lower of the pre-existing note rate or a market-based rate. BOA publicly stated that it was participating in HAMP and represented to the public that homeowners who satisfied HAMP eligibility requirements would be able to secure a permanent loan modification consistent with HAMP guidelines.

50. In 2009, BOA's website stated, unambiguously:

> If you successfully make your payments during the 3-month trial period, and the documentation provided supports the initial review, we will sign off and your modification will become permanent.

51. In June 2011, BOA amended its website. Though the format changed, the requirements and representations remained substantively the same. The eligibility requirements remained the same as stated in paragraph 43 above.

52. BOA's website listed the same documentation requirements to apply for a HAMP

modification as previously listed and added a Request for Modification and Affidavit (RMA) form, an IRS Form 4506-T Request for Transcript of Tax Return, and if the loan is not owned by Fannie Mae or Freddie Mac, a Dodd-Frank Certification Form. BOA then stated: "You can expect to hear back from us within 10 business days from when we receive all your required documents."

53.     All iterations of this website have deceptively and misleadingly led borrowers to believe that if they apply for a HAMP modification, qualify for HAMP, and make their trial payments, they will receive an offer of a permanent HAMP modification. These statements were deceptive and false at the time they were made because of the extensive enterprise and loan modification scheme described throughout this Complaint, which was aimed at denying permanent HAMP modifications to the greatest extent possible.

## FACTUAL ALLEGATIONS

54.     On January 30, 2004, the Plaintiffs executed a deed, which was filed on March 19, 2004, recording them as the owners of the Property.

55.     On December 21, 2006, the Plaintiffs executed and delivered to Fremont Investment and Loan a note (hereinafter, the "Note") with interest thereon at 8.000 percent per annum, payable as to the principal and interest in equal monthly installments of $2,674.57 commencing on February 1, 2007.

56.     To secure the obligations under the Note, the Plaintiffs executed and delivered to Mortgage Electronic Registrations Systems, Inc., acting solely as nominee for Fremont Investment and Loan a mortgage (hereinafter, the "Mortgage") dated December 21, 2006, and recorded on January 4, 2007. (*See, Mortgage Documents, attached hereto as* **Exhibit "A"**).

### The Plaintiffs enroll in the HAMP program.

57.     In early 2010, the Plaintiffs were offered a HAMP modification by Wilshire which

became effective on March 1, 2010. (*See, Home Affordable Modification Trial Period Plan, attached hereto as* **Exhibit "B"**).[1]

58.     Under the Trial Period Payment plan (hereinafter, the "TPP") during the next three consecutive months, the Plaintiffs were to pay $2,131.25 per month. Id.

59.     The Plaintiffs timely made those three TPP payments during that three-month period, which can be verified through the Plaintiffs' checking account information and cancelled checks.

60.     The TPP plan stated that if the Plaintiffs complied with the payment arrangement discussed above in ¶ 61, and the representations regarding hardships as noted in the TPP plan continued true in all material aspects, Wilshire would send the Plaintiffs a modification agreement and the Mortgage payment amounts would be reduced to a new monthly payment for the remaining term of the loan. (**Ex. "B"**, ¶ 3).

61.     As a result, the Plaintiffs fully performed their obligations with the Home Affordable Modification Trial Period Plan Agreement and were therefore due a modification of their terms with respect to the Mortgage. Id.

62.     On October 20, 2010, BOA – as part of a monthly statement – specifically noted that the HAMP TPP plan was still in effect, and even confirmed the monthly payment amount, stating:

> **Important message about your Home Affordable Modification Trial Period Plan**
>
> You are currently participating in a Home Affordable Modification Trial Period Plan. During this Trial Period, you may make your monthly payments at the Trial Period monthly payment amount, which is **$2,131.23** instead of the amount shown on this statement.
>
> You will continue to receive monthly statements during your Trial Period

---

[1] The payments to Wilshire were described as pertaining to "Investor Loan # 3000999109".

Plan that will show the payment amount based on your original home loan agreement as your original loan remains in effect and unchanged during the trial period. You will be notified once we have determined your eligibility for a permanent loan modification.

(*See attached as* **Exhibit "C"**) (emphasis in original).

63.     However, the Defendants breached the terms of the TPP/Home Affordable Modification offer and failed to modify the Mortgage terms.

64.     On September 28, 2011, Defendant HSBC recorded an assignment of mortgage (hereinafter, the "HSBC Assignment"). (*See, Assignment of Mortgage*, *attached hereto as* **Exhibit "D"**).

65.     The Plaintiffs were never notified of the assignment of the mortgage from BOA and continued to make the monthly payments on a timely basis.

66.     HSBC then ignored the Plaintiffs' valid agreement with BOA and Wilshire to modify the loan payments pursuant to HAMP, and instead raised their monthly mortgage payments, demanding exorbitant monthly payments.

67.     On November 3, 2017, HSBC filed suit against the Plaintiffs to foreclose on the Mortgage. (*See, Complaint from Montgomery County Common Pleas Case No. 2017-26369*, *attached hereto as* **Exhibit "E"**).

68.     It was at that point that the Plaintiffs learned of the scheme created by the Defendants.

69.     As a result of the scheme used to defraud the Plaintiffs, the Plaintiffs state a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), alleging that the Defendants created an association-in-fact enterprise designed to mislead and deceive borrowers through use of the United States mail and wires.

**COUNT I**
**Federal RICO 18 U.S.C. § 1962(c)**
**PATTERN OF RACKETEERING ACTIVITY**

70.     Plaintiff incorporates by reference and realleges paragraphs 1 through 69 as set forth above.

71.     Plaintiff alleges that Defendants' conduct, and the conduct of each Defendant named herein, constitutes racketeering as set forth in 18 U.S.C. § 1964(c).

72.     Pursuant to that statute:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C.A. § 1964(c).

73.     Specifically, a violation of § 1962(c) is defined as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962 (c).

74.     In summary, § 1964(c) provides relief against parties who engage in a pattern of racketeering activity as defined in § 1962(c).

75.     Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

**A.  RICO Enterprise**

76.     From at least 2009 to the present, the affiliation between BOA, Urban, and HSBC

constituted an enterprise. Defendants conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c).

77.    The RICO enterprise, which engaged in, and whose activities affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included Bank of America, N.A., and its subsidiary BAC Home Loans Servicing, LP, Urban Settlement Services, LLC, and HSBC.

78.    The members of the RICO enterprise all had a common purpose: to extend as few permanent HAMP modifications as possible while providing BOA a justification to claim that borrowers had not fulfilled their trial-payment agreements or were otherwise ineligible for HAMP modifications. At BOA's direction and with BOA's full knowledge, Urban instructed its employees to close borrowers' claim modification files without an adequate investigation, thereby deeming the borrowers to have failed the HAMP modification process, even when it was apparent from the electronic records that the borrower had provided all required information and documents. BOA and Urban executives were not only informed that the files were closed without a sufficient investigation, but actively encouraged or cajoled BOA and Urban employees to do so.

79.    The enterprise was also forged by the relationships among those associated with it. As described in greater detail in Section IV of this Complaint, BOA contracted with Urban and assigned to it the key aspects of the process of administering trial plans and providing permanent modifications to borrowers who fulfilled the terms of their trial plans. Through their respective employees, BOA and Urban coordinated their activities to frustrate the HAMP process and limit the number of homeowners who obtained permanent loan modifications, while maintaining the

appearance of compliance to regulators and the public. For example, Urban employees identified themselves as being from Bank of America – typically from the "Office of the President." Urban employees were given titles and email addresses suggesting that they were employed by Bank of America to create the false impression to borrowers that they were speaking to and corresponding with BOA when, in fact, they were interacting with Urban employees. Urban's processes guaranteed that the vast majority of HAMP applicants would not obtain permanent HAMP modifications. As part of the scheme to defraud, Urban became a "black hole" for documents sent by the homeowners by, for example, allowing the documents to "age" so that they would not support a permanent modification. For its part, BOA would deny modifications, claiming that the information (which was residing with Urban) had not been received.

80.    This RICO enterprise has remained in existence for several years, enabling its members to pursue the enterprise's purpose. BOA and Urban conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that began in 2009 and continues through the present and has consisted of hundreds of thousands (or millions) of acts of mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and extortion in violation of 18 U.S.C. §§1951(a) and (b)(2).

**B.  Mail and Wire Fraud**

81.    BOA, Wilshire, and Urban engaged in a scheme or artifice to defraud borrowers by stalling and hindering the loan modification process and misleading the borrowers to prevent many of the homeowners who are eligible for permanent loan modifications and who have met the requirements for participation in HAMP from receiving the loan modifications to which they are entitled.

82.    BOA, Wilshire, and Urban were aware of this scheme and actively participated in

it, establishing delaying tactics that would guarantee that as few borrowers as possible would receive their loan modifications.

83.    The U.S. mail or wire services, including internet, telephone and email were used in furtherance of the scheme. Use of the mail or wire services were either known to BOA, Wilshire, and Urban or it was reasonably foreseeable that they would be used for this purpose.

84.    As described throughout this Complaint, Defendants' repeated violations of the federal mail and wire fraud statutes, which have all occurred in the last few years, include:

a. Providing instructions over the internet as to the steps a homeowner would need to take to secure a permanent loan modification under HAMP with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to follow the steps stated on their website that would enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

b. Sending instructions to Plaintiffs and other homeowners by mail, fax, email or internet directing them to provide documents and other information to be considered for a HAMP loan modification, thereby misleading them to believe they would be given a permanent modification if they complied with Defendants' instructions, with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

c. Providing Trial Period Plans to Plaintiffs and other homeowners by mail, email or internet, which purported to offer permanent modifications in 4 months if certain terms were met, with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to perform the contracts as promised, and that only a small percentage of homeowners would receive permanent modifications as represented in the Trial Period Plan Agreements.

d. Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because they had not provided necessary financial documents, when in fact Defendants knew that the homeowners had provided the documents.

e. Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because their financial information was not timely, even though Defendants knew that the documents were timely when the homeowners provided

them.

f. Intentionally providing thousands of homeowners who applied for HAMP loan modifications, and who were qualified to receive HAMP modifications, with in-house loan modifications that were less advantageous to homeowners but more profitable to BOA.

85.     The scheme to defraud that was perpetrated by BOA, Wilshire, and Urban and their employees and which was at the center of the racketeering activity, involved issuing trial-payment agreements to thousands of eligible applicants, when BOA intended to deny the vast majority of those agreements on entirely false grounds.

86.     On information and belief, as part of and in furtherance of the scheme to defraud, Urban, Wilshire, and BOA would receive documents and information by mail, fax, telephone and/or email from homeowners applying for and fulfilling their Trial Period Plan Agreements and intentionally delay acting on the documents for several months.

87.     On information and belief, as part of and in furtherance of the scheme to defraud, Urban, Wilshire, and BOA would receive documents and information by mail, fax, telephone and/or email from homeowners and intentionally fail to record receipt of the documents on electronic systems or to convey the modification package to underwriting for months and often not until the documents had aged beyond the point that they could be used for underwriting.

88.     On information and belief, as part and in furtherance of the scheme to defraud, Urban, Wilshire, and BOA intentionally manipulated and falsified data on customers' electronic files so that files could be closed, and modification applications rejected.

89.     On information and belief, as part and in furtherance of the scheme to defraud, Urban, Wilshire, and BOA would send borrowers notices by mail, fax, telephone and/or email that information or documentation was missing from the homeowners' modification files when Urban, Wilshire, and BOA knew that the homeowners had provided the information.

90.     On information and belief, as part of and in furtherance of the scheme to defraud, Urban, Wilshire, and BOA regularly sent customers notices of denial by mail, fax, telephone and/or email that Urban and BOA knew to be based on reasons that were untrue.

**C.  Extortion**

91.     On information and belief, during the relevant times, and in furtherance of and for the purpose of executing and/or attempting to execute the above-discussed scheme and artifice to defraud, the Defendants and others not named as defendants in this Complaint on numerous occasions aided and abetted and conspired to and attempted to and did interfere with, obstruct, delay or affect "commerce" as the term is defined in 18 U.S.C. § 1951 by "extortion" as defined in 18 U.S.C. § 1951(b)(2). The Defendants unlawfully attempted to and/or did induce Plaintiffs to part with various property interests to which Defendants would not have been entitled had they acted in compliance with HAMP. Such acts were in violation of 18 U.S.C. § 1951(b)(2).

92.     On information and belief, in furtherance of the scheme to defraud and deprive the Plaintiffs of money and other property rights, Defendants agreed and conspired among themselves, with each other and with others not named as defendants, to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which these Defendants are not entitled through extortion.

93.     Defendants intentionally and knowingly placed the Plaintiffs in an economically disadvantageous position by instructing them to make trial payments in an amount less than the amount owed under their unmodified mortgages. This placed the Plaintiffs in default or put them further into default than they otherwise would have been.

94.     Defendants placed the Plaintiffs in this position at the same time Defendants were involved in the scheme to deny mortgage modifications, as described in detail throughout this

Complaint. Defendants thus placed the Plaintiffs into default, or further into default, yet intended to deny them permanent mortgage modifications.

95.     After the Plaintiffs were in default or further in default as a result of having made trial payments, the Defendants transferred the Mortgage to HSBC to engage in foreclosure and/or collections activity.

**D.  Pattern of Racketeering**

96.     These violations constitute a pattern of racketeering. They are related in that they share the same purpose of defrauding homeowners, involve the same participants, victims, and methods of commission. And because the Defendants' large-scale criminal activities occurred over a period of several years and are continuing unabated, they amount to or pose a threat of continued criminal activity.

97.     Each of the Defendants associated with the RICO enterprise knew of the existence of the enterprise and its related activities. BOA, through its designated officers and employees, devised the loan-modification scheme and coordinated with Wilshire and Urban to carry it out, with the overall goal of then transferring the Mortgage to HSBC.

98.     BOA, Wilshire, and Urban and their employees conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity. Each of the Defendants participated in the enterprise's decision-making or were plainly integral to carrying out the scheme to defraud. Specifically, BOA set up the process for approving the loan modifications to ensure that the vast majority of applications would not result in permanent modifications in the time contemplated by HAMP. BOA supervised Wilshire and Urban and coordinated with them to ensure that the processes were carried out according to plan.

99.     As part of their participation, Urban, Wilshire, and BOA knowingly and

intentionally sent, mailed, and transmitted or caused to be sent, mailed, or transmitted fraudulent solicitations, instructions, and Trial Period Plan Agreements in interstate or foreign commerce. These fraudulent documents constituted numerous and repeated violations of the federal mail and wire fraud statutes in violation of 18 U.S.C. §§ 1341, 1343, extortion in violation of 18 U.S.C. §§ 1951(a) and (b)(2), as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 (1), 1962 (c). Defendants knew, or at a minimum were reckless in not knowing, that the documents were misleading, deceptive, and/or false when sent, as a result of the actions of their officers and employees pursuant to the loan-modification scheme outlined in this Complaint.

100.   In addition, BOA, Wilshire, and Urban sent, mailed and transmitted or caused to be sent mailed or transmitted, in interstate or foreign commerce, notices containing false and fraudulent information pertaining to the status of borrowers' efforts to obtain a permanent loan modification under HAMP to the Plaintiffs and to thousands of other homeowners. These fraudulent notices constituted numerous and repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(1), 1962(c).

101.   Accordingly, Defendants' conduct constitutes a "pattern" of racketeering activity. 18 U.S.C. § 1961(5).

102.   At all times relevant hereto, beginning on or around early 2010 and continuing through the transfer of the Mortgage to HSBC and HSBC's unlawful attempts to foreclose on the Property on November 3, 2017, each Defendant conducted and participated in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). 212.

## COUNT II
## Federal RICO 18 U.S.C. § 1962(a)
## RACKETEERING

103.    Plaintiff incorporates by reference and realleges paragraphs 1 through 69 and 71

through 101 as set forth above.

104.    Section 1962(a) provides relief against parties who use income generated through

a pattern of racketeering activity,

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

18 U.S.C. § 1962 (a).

105.    At all times relevant hereto, beginning on or around early 2010 and continuing

through the transfer of the Mortgage to HSBC and HSBC's unlawful attempts to foreclose on the

Property on November 3, 2017, Defendants received income derived from a pattern of racketeering

activity to use or invest a part of such income or the proceeds of such income in the establishment

and operation of an enterprise that is engaged in, or the activities of which affect, interstate or

foreign commerce, in violation of 18 U.S.C. § 1962(a).

106.    As alleged in the preceding section, on or around 2009-2010, Defendants formed

the RICO enterprise to effectuate Defendants' pattern of racketeering activity.

107.    All Defendants agreed to and did use income received directly from a pattern of racketeering activity to control, establish and operate the mortgage modification program, which was engaged in and affected interstate commerce, and for the unlawful purpose of intentionally defrauding the Plaintiffs and thousands of other homeowners.

108.    As a direct and proximate consequence of the conduct of the Defendants and each of them as alleged herein, Plaintiff has been injured in its business and property, causing Plaintiff to suffer monetary damages with said damages to be proven at the time of trial.

109.    Because of the Defendants' violations of 18 U.S.C. § 1962(a), the Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### COUNT III
### Federal RICO 18 U.S.C. § 1962(d)
### RACKETEERING

110.    Plaintiff incorporates by reference and realleges paragraphs 1 through 69 and 71 through 101 as set forth above.

111.    Section 1962(d) provides relief against those who conspire to violate the racketeering laws.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962 (d).

112.    At all times relevant hereto, beginning on or around early 2010 and continuing through the transfer of the Mortgage to HSBC and HSBC's unlawful attempts to foreclose on the Property on November 3, 2017, the Defendants and each Defendant agreed to and did conspire to violate 18 U.S.C. §§ 1962 (a) and (c), as alleged above and incorporated herein, in violation of 18 U.S.C. § 1962(d).

113.    The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise described above; and to receive income derived from a pattern of racketeering activity and to use such income or the proceeds of such income in the establishment and operation of that enterprise.

114.    The Defendants have knowingly, willfully and intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise described previously through a pattern of racketeering activity.

115.    The Defendants have knowingly, willfully and intentionally conspired and agreed to receive income derived from a pattern of racketeering activity and to use such income or the proceeds of such income in the establishment and operation of the enterprise described previously.

116.    The Defendants knew that their actions as alleged above were part of a pattern of racketeering activity and agreed to the commission of those acts to further the conspiratorial scheme described above.

117.    The Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and (a), in violation of 18 U.S.C. § 1962(d).

118.    As a direct and proximate consequence of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in its business and property, causing Plaintiff to suffer monetary damages to be proven at the time of trial.

119.    Because of Defendants' violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT IV**
**Pennsylvania Common Law**
**BREACH OF CONTRACT**

120.    Plaintiff incorporates by reference and realleges paragraphs 1 through 69 as set forth above.

121.    The TPP and HAMP modification entered into between the Plaintiffs and Defendants BOA and Wilshire constituted a valid contract.[2]

122.    Although the Plaintiffs performed on their end with respect to the TPP program, the Defendants apparently never provided the promised HAMP modification.

123.    The Plaintiffs have suffered damages from the breach, including late fees, mortgage foreclosure actions by Defendant HSBC, and other damages.

**CLAIM FOR RELIEF**

WHEREFORE, the Plaintiffs hereby demand judgment against the Defendants as follows:

1) On Counts I-III, judgment against the Defendants, jointly and severally, for threefold compensatory damages sustained by the Plaintiffs, including actual damages, compensatory damages, punitive damages, costs including reasonable attorney's fees, pre-judgment and post-judgment interest, and any and all other relief this Honorable Court deems just and appropriate.

2) On Count IV, judgment against the Defendants, jointly and severally, for compensatory damages sustained by the Plaintiffs, including actual damages, compensatory damages, punitive damages, costs including reasonable attorney's

---

[2] Notably, the Third Circuit and other jurisdictions have concluded that TPPs operate as valid contracts. Bukowski v. Wells Fargo Bank, N.A., 757 Fed.Appx. 124, 129–30 (3d Cir. 2018); *see also,* George v. Urban Settlement Servs., 833 F.3d 1242, 1260 (10th Cir. 2016) ("[W]e conclude that the language in [the defendant's] TPP documents clearly and unambiguously promises to provide permanent HAMP loan modifications to borrowers who comply with the terms of their TPPs.").

fees, pre-judgment and post-judgment interest, and any and all other relief this Honorable Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by Jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.


Dated: <u>10 OCT 2022</u>                    Respectfully Submitted,

/s/ Andres Jalon
_____
ANDRES JALON, ESQ.
**JALON & ASSOCIATES**
17 W. Airy Street
Norristown, Pennsylvania 19401
ajalon@jalonesq.com
*Attorney for Plaintiffs, Pro Se*



_____
ROOK ELIZABETH RINGER, ESQ.
**THE LAW OFFICE OF ROOK RINGER**
222 San Marco Ave., Ste. "C"
St. Augustine, FL 32084
904.265.7665 (Office)
904.677.7812 (Fax)
rook@ringer.law
*Attorney for Plaintiffs*
*Pro Hac Vice to be Applied For*